UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

DONALD H. WICKHAM,

        Plaintiff,

    v.                            Civil Action 2:20-cv-401
                                        Judge Sarah D. Morrison
                                        Magistrate Judge Chelsey M. Vascura

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

REPORT AND RECOMMENDATION

        Plaintiff, Donald H. Wickham ("Plaintiff"), brings this action under 42 U.S.C. § 405(g)

for review of a final decision of the Commissioner of Social Security ("Commissioner") denying

his application for Period of Disability, Disability Insurance, and Supplemental Security Income

Benefits. This matter is before the Court on Plaintiff's Statement of Errors (ECF No. 9), the

Commissioner's Memorandum in Opposition (ECF No. 13), Plaintiff's Reply (ECF No. 14), and

the administrative record (ECF No. 7). For the reasons that follow, it is **RECOMMENDED** that

Plaintiff's Statement of Errors be **OVERRULED** and that the Commissioner's decision be

**AFFIRMED**.

## I.      BACKGROUND

        Plaintiff filed his applications for Title II Period of Disability and Disability Insurance

Benefits and Title XVI Supplemental Security Income Benefits on March 30, 2016, alleging that

he had been disabled since March 1, 2015. (R. 219, 226.) On January 15, 2019, following

administrative denials of Plaintiff's applications initially and on reconsideration, a video hearing

was held before Administrative Law Judge Francine Serafin (the "ALJ"). (*Id.* at 66–87.)

Plaintiff, represented by counsel, appeared and testified.  Vocational expert Bill Tanzey (the "VE") also appeared and testified at the hearing.  On February 5, 2019, the ALJ issued a decision denying benefits.  (*Id.* at 18–30.)  On February 14, 2019, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. 1–4.)  Plaintiff then timely commenced the instant action.  (ECF No. 1.)

In his Statement of Errors (ECF No. 9), Plaintiff asserts two contentions of error: (1) the ALJ failed to properly apply the controlling weight test to the opinions of Plaintiff's treating physicians; and (2) the ALJ failed to provide good reasons for according less than controlling weight to the opinions of Plaintiff's treating physicians.

## II.    THE ALJ'S DECISION

On February 5, 2019, the ALJ issued a decision finding again that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. 18–30.)  At step one of the sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantial

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 404.1520(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.    Is the claimant engaged in substantial gainful activity?
2.    Does the claimant suffer from one or more severe impairments?
3.    Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.    Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.    Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

gainful activity since his alleged disability onset date of March 1, 2015. (*Id.* at 21.) At step two, the ALJ found that Plaintiff has the severe impairments of degenerative disc disease of the lumbar spine with stenosis, cervicalgia, major depressive disorder, post-traumatic stress disorder, and panic disorder. (*Id.*) She further found at step three that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) At step four of the sequential process, the ALJ set forth Plaintiff's residual functional capacity ("RFC")[2] as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except he can frequently climb ramps and stairs, but only occasionally climb ladders, ropes, or scaffolds. The claimant can frequently balance, stoop, kneel, and crouch. He can occasionally crawl. The claimant must avoid frequent exposure to extreme vibration or workplace hazards such as moving machinery or unprotected heights. The claimant is capable of occasional social interaction with coworkers and supervisors, but he should never interact with the public or crowds. The claimant is capable of simple, routine, repetitive work that does not require assembly line or production rate pace or quotas. He is capable of tolerating a few changes in the work environment, which is defined as three-to-four changes per workday or work shift.

(*Id.* at 23.)

At step five of the sequential process, the ALJ, relying on the VE's testimony, found that Plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy. (*Id.* at 29.) The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act. (*Id.*)

### III.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to

---

[2] A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1).

proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).

Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

## IV.     ANALYSIS

Plaintiff asserts two contentions of error: (1) the ALJ failed to properly apply the controlling weight test to the opinions of Plaintiff's treating physicians, Michael Sayegh, M.D., and Patricia Gainor, M.D.; and (2) the ALJ failed to provide good reasons for according less than controlling weight to the opinions of Plaintiff's treating physicians. Because both contentions of

error bear on the treating physician rule, the undersigned will consider both contentions of error together.

**A.      Standards for Evaluating Treating Source Opinions**

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(c).  Where a treating source's opinion is submitted, the ALJ generally gives deference to it "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . . ."  20 C.F.R. § 416.927(c)(2); *Blakley*, 581 F.3d at 408.  If the treating physician's opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight."  20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors-namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion.

*Id*.  Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion."  20 C.F.R. § 416.927(c)(2).  Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550

(6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth

Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important

when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v.

Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson*

factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222

(6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to

explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical

opinion evidence within the written decision).

Finally, the Commissioner reserves the power to decide certain issues, such as a

claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will

consider opinions of treating physicians "on the nature and severity of your impairment(s),"

opinions on issues reserved to the Commissioner are generally not entitled to special

significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

### B.    Michael Sayegh, M.D.

After Plaintiff underwent three surgeries on his back in 2010 and 2011, Dr. Sayegh

treated Plaintiff for back pain from April 21, 2016,[3] through November 29, 2018.  (R. 855–71,

913–23, 1037–38.)  On April 21, 2016, Plaintiff reported chronic, shooting pain in his neck, mid

back, and lower back that he rated as 7 out of 10.  (R. 855.)  Dr. Sayegh consistently listed

Plaintiff's diagnoses as:

> 1. Low back pain, sprain/strain.  2. Sciatica.  3. Herniated nucleus pulposus.
> 4. Postlaminectomy syndrome x 3.  5. Spondylosis.  6. Facet syndrome.
> 7. Cervicalgia. 8. Radiculopathy. 9. Degenerative disc disease. 10. Spinal stenosis.
> 11. Herniated nucleus pulposus with myelopathy.  12. Thoracic pain.
> 13. Radiculopathy, sprain/strain.  14. Herniated nucleus pulposus. [*sic*]
> 15. Degenerative disc disease. [*sic*] 16. HTN. 17. Anxiety.  18. Depression.
> 19. Sleep disturbance.  20. Tobacco abuse.

(R. 865, 906, 914, 916, 918, 920, 922, 1037.)   At each visit after April 21, 2016, Plaintiff

reported constant pain in his neck, mid back, and low back, which he rated as either a 5 or 6 out

of 10.  (R. 865, 906, 914, 916, 918, 920, 922, 1037.)   Plaintiff was prescribed 10 mg of Norco

up to four times per day as needed for his pain, and continued with this dose until July 31, 2018,

when Dr. Sayegh tapered Plaintiff's medication to up to three times per day as needed.  (R. 922.)

Plaintiff consistently reported that the medication seemed to be helping to improve his symptoms

and lifestyle.  (R. 865, 906, 914, 916, 918, 920, 922, 1037.)   The treatment notes also uniformly

record that throughout the treatment period, physical examination of Plaintiff's neck, mid, and

low back areas showed trigger points and tenderness bilaterally and in the paraspinal muscles;

neurological examination of his upper and lower extremities was intact; bilateral straight leg

---

[3] The record also contains an evaluation performed by Dr. Sayegh on February 9, 2009 (R. 853–54).  However, this evaluation pre-dated Plaintiff's three back surgeries in 2011–12 and his alleged disability onset date of March 1, 2015, and is also separated in time from the remainder of Dr. Sayegh's treatment of Plaintiff by seven years.

raising tests were negative; and grips and push-pulls were strong and equal.  (R. 855, 906, 914, 916, 918, 920, 922, 1037.)

On May 22, 2016, Plaintiff underwent MRIs on his cervical and thoracic spine at Dr. Sayegh's recommendation.  (R. 856, 862–64.)  These images demonstrated straightening of the normal cervical lordosis, which may indicate muscle spasm; central disc protrusion at C4–5 without cord compression; central protrusion of the C5–6 disc causing mild cord flattening; disc degeneration at C4–5 and C5–6; and disc degeneration and focal right paramedian protrusion at T9–10 without evidence for cord compression or neural foraminal stenosis.  (*Id.*at 862, 864.)

Dr. Sayegh provided two opinions.  The first was a Physical Medical Source Statement dated August 23, 2016.  (R. 882–86.)  Dr. Sayegh listed Plaintiff's diagnoses as "low back pain, sprain/strain; sciatica; HNP [herniated nucleus pulposus]; postlam[inectomy] syndrome x 3, spondylosis; facet syndrome; cervicalgia; radiculopathy; spinal stenosis; HNP with myelopathy; thoracic pain; DDD [degenerative disc disease]; anxiety; depression; sleep disturbance."  (R. 882.)  Dr. Sayegh opined that, as a result of Plaintiff's impairments, Plaintiff could walk less than one block without severe pain; could sit for 15–30 minutes at a time and for about two hours total in a day; could stand for 15–30 minutes at a time and for less than two hours total in a day; would require a job that permits shifting positions at will from sitting, standing, or walking; would need to include periods of walking around during the work day; would sometimes need unscheduled breaks, approximately once per hour for fifteen minutes each; could rarely lift less than 10 pounds and never more than 10 pounds; could never twist, stoop, crouch/squat, or climb ladders and could rarely climb stairs; could use his hands to grasp, turn, or twist objects at more 20% of the work day; could use his fingers for fine manipulations at most 20% of the work day; could use his arms to reach in front of his body at most 25% of the work day; could use his arms

to for overhead reaching for at most 5% of the work day; would be off-task more than 25% of the work day; would be capable of low-stress work (noting that chronic pain can lead to increased anxiety and depression); would have "good days" and "bad days"; would be likely to be absent from work about four days per month; and should avoid temperature extremes, wetness, noise, and hazards. (R. 883–85.)

The second opinion was a medical source statement dated September 21, 2016. (R. 903–04.) Dr. Sayegh listed the same diagnoses for Plaintiff as he had in his August 23, 2016 opinion. (R. 903.) He noted the two MRI images obtained on May 16, 2016. (*Id.*) Dr. Sayegh further noted that Plaintiff was "pending cervical fusion" with another provider, Dr. Shannon; and that in future, Plaintiff may possibly require a lumbar epidural steroid injection, facet injection, rhizotomy, back brace, "CT, PT." (*Id.*) Dr. Sayegh then opined the following limitations: "No bending, lifting, stooping, crawling, pushing, pulling, climbing. [Plaintiff]'s ability to concentrate may be affected by pain and opioid therapy (pain med)." (R. 904.)

The ALJ summarized Dr. Sayegh's treatment notes and opinions and explained that she gave the opinions "little weight" because they were inconsistent with Dr. Sayegh's treatment notes:

> The undersigned gives Dr. Sayegh's opinions little weight because these significant limitations are inconsistent with his own physical examinations of the claimant. He routinely reported that the claimant had tenderness and trigger points in the paraspinal muscles, but negative straight leg raising, no neurological deficits, and strong grip, push, and pulls (11F pp 4, 13; 18F pp 2, 4, 6, 8, 10; 22F p 1).

(R. 26.)

The undersigned finds no error with the ALJ's consideration and weighing of Dr. Sayegh's opinions. The ALJ articulated the weight she afforded the opinion and properly declined to afford it controlling weight on the grounds it was inconsistent with Dr. Sayegh's documentation of Plaintiff's physical examinations. Indeed, Dr. Sayegh's significant limitations

on grasping and complete preclusion of pushing or pulling run opposite to his repeated findings

that Plaintiff's "[g]rips and push-pulls are strong and equal."  (R. 855, 906, 914, 916, 918, 920,

922, 1037.)  And other than "trigger points and tenderness bilaterally in the paraspinal muscles,"

Dr. Sayegh's physical examinations of Plaintiff revealed no remarkable findings.  (*Id.*)  Further,

although Dr. Sayegh noted the existence of the May 22, 2016 MRI images in his September 21,

2016 opinion, he did not explain how the MRI findings supported his significant opined

limitations.  As the Sixth Circuit has held, an ALJ may properly assign little weight to opinions

from treating sources "where the physician provided no explanation for the restrictions . . . and

cited no supporting objective medical evidence."  *Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x

563, 567 (6th Cir. 2016).  The undersigned therefore concludes that the ALJ did not violate the

treating physician rule or otherwise err in her consideration and weighing of Dr. Sayegh's

opinions.

## C.  Patricia Gainor, M.D.

Plaintiff saw Dr. Gainor for regular mental health assessments (twelve in all) from April

28, 2014, through June 19, 2018.  (R. 397–475, 892–901, 928–56, 965–75, 979–88.)  At each of

these assessments, Plaintiff reported depression, anxiety, and trouble sleeping related to his

mother's ill health and death, his difficulty paying child support, childhood abuse, and travel.

(*Id.*)  From April 28, 2014, through December 21, 2015, Dr. Gainor listed Plaintiff's diagnoses

as major depressive disorder, generalized anxiety disorder, and agoraphobia.  (R. 402, 410, 418,

435, 453.)  However, from April 18, 2016 through June 19, 2018, Dr. Gainor's diagnoses were

listed as major depressive disorder, agoraphobia, and post-traumatic stress disorder.  (R. 471–73,

899–900, 934, 954, 973, 986–87.)  Dr. Gainor consistently prescribed a combination of Pamelor

and Klonopin for Plaintiff's depression and anxiety, and doses were constant throughout the

treatment period except that Pamelor was increased on March 6, 2017.  (R. 933.)

Dr. Gainor occasionally assessed Plaintiff as having impaired abstract thinking.  (R. 449, 467, 942, 952, 984.)  She also occasionally found Plaintiff's affect to be blunted, flat, or labile.  (R. 401, 431, 469, 943.)  Once or twice, Dr. Gainor noted rapid, pressured, loud, or soft speech (R. 399, 431); disheveled appearance (R. 429); limited insight into problems (R. 431, 984); and limited knowledge of current events and past history (R. 467).  Otherwise, all areas of assessment (speech; associations; thought processes, abnormal or psychotic thoughts; judgment and insight; orientation to person, place, and time; recent and remote memory; attention span and concentration; fund of knowledge; and mood and affect) reflected normal findings at all assessments.  (R. 397–475, 892–901, 928–56, 965–75, 979–88.)

On August 15, 2016, Dr. Gainor issued a Medical Source Statement.  (R. 876–80.)  Dr. Gainor opined that Plaintiff suffered from major depressive disorder and generalized anxiety disorder.  (R. 876.)  She further opined that Plaintiff was "unable to meet competitive standards" for understanding and remembering detailed instructions, carrying out detailed instructions, setting realistic goals or making plans independently of others, and dealing with the stress of skilled or semi-skilled work.  (R. 878.)  Dr. Gainor also opined that Plaintiff was "seriously limited" in the areas of interacting appropriately with the general public and traveling in an unfamiliar place, and "limited but satisfactory" in the areas of maintaining socially appropriate behavior, adhering to basic standards of neatness and cleanliness, and using public transportation.  (Id.)  Dr. Gainor opined that Plaintiff would be likely to miss more than four days of work per month due to his impairments or treatment.  (R. 879.)

The ALJ summarized Dr. Gainor's treatment notes and opinions and explained that she gave the opinion "little weight" because they were inconsistent with Dr. Gainor's treatment notes:

> The undersigned gives little weight to this opinion because it is not supported by her own treatment notes. While the psychotherapy notes document the claimant's complaints about anxiety and panic around people and while driving, Dr. Gainor's mental status examinations were generally unremarkable and the claimant's treatment plan was not often changed.

(R. 27.)

The undersigned finds no error with the ALJ's consideration and weighing of Dr. Gainor's opinions. The ALJ articulated the weight she afforded the opinion and properly declined to afford it controlling weight on the grounds it was inconsistent with Dr. Gainor's documentation of Plaintiff's mental health assessments. For instance, although Dr. Gainor's August 15, 2016 Medical Source Statement listed a diagnosis of generalized anxiety disorder, Dr. Gainor's treatment notes had not reflected this diagnosis for Plaintiff since December 21, 2015 (two assessments prior to the Medical Source Statement). (R. 453, 471–73, 899–900.) More importantly, although Dr. Gainor opined that Plaintiff was "unable to meet competitive standards" for understanding and remembering detailed instructions and carrying out detailed instructions, her assessments uniformly found no impairment in Plaintiff's memory or attention span and concentration. Indeed, Dr. Gainor's mental health assessment of August 15, 2016—the same date as her Medical Source Statement—reflected normal findings in *all* areas of assessment. (R. 896–98.) And nowhere in Dr. Gainor's treatment notes, spanning four years, is there any assessment of Plaintiff's ability to set goals or make plans. Absent further explanation from Dr. Gainor connecting her treatment notes to her opinions, the ALJ did not err in declining to credit Dr. Gainor's opinion. *See Ellars*, 647 F. App'x at 567. The undersigned therefore concludes that the ALJ did not violate the treating physician rule or otherwise err in her consideration and weighing of Dr. Gainor's opinion.

**D.      Inconsistency between a treating source's opinions and treatment notes is properly considered as part of the controlling weight test.**

Plaintiff argues that the ALJ failed to engage in the treating physician controlling weight test or to give good reasons for discounting his treating providers' opinions.  According to Plaintiff, inconsistency between a treating source's opinions and treatment notes is not part of the controlling weight test of 20 C.F.R. § 404.1527(c)(2), but instead goes to the "consistency" factor of § 404.1527(c)(4) used to evaluate medical opinions only after the controlling weight test has been applied.  In other words, Plaintiff argues that the ALJ skipped over the controlling weight test and went straight to evaluating his providers' opinions under factors relevant only to non-controlling treating physician opinions.  (Statement of Errors 9, ECF No. 9.)

Plaintiff's argument lacks merit.  The controlling weight test requires ALJs to consider whether the treating source's opinion is "inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).  The fact that "consistency" is also a factor used to evaluate all medical opinions, from a treating source or otherwise, under § 404.1527(c)(4) does not strip § 404.1527(c)(2) of its consistency analysis.  Accordingly, "ALJs may discount treating-physician opinions that are inconsistent with substantial evidence in the record, like the physician's own treatment notes."  *Leeman v. Comm'r of Soc. Sec.*, 449 F. App'x 496, 497 (6th Cir. 2011).  *See also Price v. Comm'r Soc. Sec. Admin.*, 342 F. App'x 172, 176 (6th Cir. 2009) (affirming ALJ's decision to not afford controlling weight to treating physician's opinion in part due to inconsistency with treating physician's own treatment notes); *Lester v. Soc. Sec. Admin.*, 596 F. App'x 387, 389 (6th Cir. 2015) (same); *Smead v. Colvin*, 940 F. Supp. 2d 653, 661 (S.D. Ohio 2013) (same).  Inconsistency between a treating physician's opinion and treatment notes also constitutes a "good reason" for not giving a treating physician's opinion controlling weight. *See Anderson v. Comm'r of Soc. Sec.*, 195 F. App'x 366, 370 (6th Cir. 2006).  Nor is it reversible

error that the ALJ did not expressly mention the controlling weight test, because her analysis

nonetheless conformed to § 404.1527(c)(2)'s requirements. *See Nelson v. Comm'r of Soc. Sec.*,

195 F. App'x 462, 472 (6th Cir. 2006) ("The ALJ thus 'met the goal of § 1527[(c)](2)—the

provision of the procedural safeguard of reasons—even though she has not complied with the

terms of the regulation.'") (quoting *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x 456, 462 (6th Cir.

2005) and *Wilson*, 378 F.3d at 547).

The cases cited by Plaintiff in support of his position do not persuade the undersigned

otherwise. *See Miller v. Comm'r of Soc. Sec.*, No. 3:18-cv-281, 2019 WL 4253867, at *4 (S.D.

Ohio, Sept. 9, 2019) (collecting cases). Those cases are non-binding on this Court and are

contrary to the guidance provided by the Sixth Circuit in, *e.g.*, *Leeman*, *Price*, *Lester*, and

*Nelson*. The undersigned therefore concludes that the ALJ did not violate the treating physician

rule or otherwise err in her consideration and weighing of Dr. Sayegh's and Dr. Gainor's

opinions by relying on the inconsistency between their opinions and treatment notes.

## V.    DISPOSITION

In sum, from a review of the record as a whole, the Court concludes that substantial

evidence supports the ALJ's decision denying benefits. For the foregoing reasons, it is

**RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM**

the Commissioner of Social Security's decision.

## PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen

(14) days of the date of this Report, file and serve on all parties written objections to those specific

proposed findings or recommendations to which objection is made, together with supporting

authority for the objection(s). A Judge of this Court shall make a *de novo* determination of those

portions of the Report or specified proposed findings or recommendations to which objection is

made.  Upon proper objections, a Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the District Judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE